IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DORRELL McKEE-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. **02-1093-CJP** |
| | ) | |
| LT. MITCHELL, and | ) | |
| MEDICAL TECHNICIAN REED, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

Before the Court is defendants' Oral Motion for Judgment as a Matter of Law, which was

taken under advisement at the trial of this case. **(Tr. 142, 155)**.  The Court granted the parties

fourteen days in which to file memoranda addressing the motion. **(Tr. 155)**.  Neither party filed

a memorandum.

Plaintiff Dorrell McKee-Bey filed suit pursuant to 42 U.S.C. § 1983 alleging that

defendants  violated his constitutional rights by being deliberately indifferent to his serious

medical needs in October, 2000, while he was incarcerated at Menard Correctional Center.

The parties consented to final disposition by a magistrate judge and waived their jury

demands **(Docs. 62, 68-70)**.  The case was tried before the undersigned.  At the close of

plaintiff's case-in-chief and at the close of all the evidence, defendants made oral motions for

judgment as a matter of law under **Fed. R. Civ. P.  52(c)**.

Pursuant to **Rule 52(a)**, "the court shall find the facts specially and state separately its

conclusions of law thereon."  **Rule 52(c)** provides that:

> If during a trial without a jury a party has been fully heard on an issue and the court finds
> against the party on that issue, the court may enter judgment as a matter of law against
> that party with respect to a claim or defense that cannot under the controlling law be

1

maintained or defeated without a favorable finding on that issue, or the court may decline
to render any judgment until the close of all the evidence. Such a judgment shall
be      supported by findings of fact and conclusions of law as required by subdivision
(a) of this rule.

## Findings of Fact

The final pre-trial order **(Doc. 64)** establishes the following uncontroverted facts:

1.      Plaintiff was an inmate at Menard Correctional Center in September, 2000.

2.      Defendant Craig Mitchell was a Correctional Lieutenant at Menard.

3.      Defendant Rick Reed was a Correctional Medical Technician at Menard.[1]

4.      Plaintiff was treated for orchitis[2] in the health care unit at Menard from

   September 19, 2000, to September 29, 2000.

5.      On October 17, 2000, medical technician R. Morris (not a party to this suit)

   examined plaintiff and noted a plan of "reassurance and refer to the doctor."

6.      On October 18, 2000, Dr. Kumar (not a party) examined Plaintiff and admitted

   him to the infirmary.

The Court makes the following findings of fact:

1.      McKee-Bey assaulted a lieutenant while he was incarcerated at Galesburg
   Correctional Center in 1999.  He was prosecuted in state court for that assault.
   On October 12, 2000, he had a court appearance in Galesburg in connection with
   that charge.  Upon his return to Menard that day, he noticed swelling in his
   testicle/scrotum area.  (Tr. 8-12).

2.      Plaintiff testified that he got worse in the following days.  There was swelling, the
   skin on his scrotum began to "peel back," and his scrotum was discolored.  (Tr.
   14).

3.      On October 17, 2000, a phone call was made to the HCU, and a med tech named
   Morris examined plaintiff.  Plaintiff understood that he was supposed to get
   emergency medical attention, but did not receive it on that day.  (Tr. 14).

---

[1]Reed is also a licensed practical nurse.  (Tr. 5).

[2]Orchitis is an inflammation or infection of the duct which lies on the posterior surface of
the testicle, with inflammation or infection extending into the adjacent testicle.

4.       On October 18, 2000, Plaintiff told Officer Huff (not a party), who was the gallery officer, about his situation.  (Tr. 14).

5.       When plaintiff went with his gallery to commissary on October 18, 2000, Plaintiff met defendant Mitchell and told him that he was in serious pain and was bleeding.  (Tr. 15).  Mitchell told Plaintiff to get back with his line or he would be sent to seg.  (Tr. 15).

6.       It was about 10:30 a.m. when plaintiff talked to Mitchell.  (Tr. 16).

7.       The first time that plaintiff informed Mitchell of his problem was the morning of October 18, 2000.  (Tr. 20).

8.       Mitchell told plaintiff to put in a sick call slip.  (Tr. 22).

9.       In the cellhouse on that same day, plaintiff saw Reed.  Plaintiff told Reed that he was in "extreme pain," and that he was "bleeding with blood and pus gushing out of his scrotum sack."  Reed said he was busy and  would be back to see him, but he did not come.  (Tr. 15).

10.      Reed had previously seen Plaintiff for similar complaints on September 15, 2000.  He was admitted to the HCU for those problems on September 19, 2000.  (Tr. 13).

11.      Plaintiff did not get any medical treatment during the day shift on October 18, 2000.  He asked officers on the next shift to get him medical attention.  An officer named Horner called the HCU, and plaintiff was seen by Dr. Kumar at about 8:20 p.m.  (Tr. 16, 24).

12.      In order to be seen by a health car provider at Menard, an inmate can put in a sick call slip.  Another way of getting care is that, when presented with an emergency, an IDOC employee can call to get the inmate seen.  (Tr. 30).

13.      Plaintiff's first contact with Mitchell and Reed about the problems that began on October 12, 2000, was on October 18, 2000.  (Tr. 31-32).

14.      Plaintiff walked to the commissary on October 18, 2000, which is "a ways" from the cellhouse.  (Tr. 34-35).  He was walking back from commissary when he saw Mitchell and Reed.  (Tr. 35).  He testified that he was "gushing blood" at that point, and that blood was going through his pants and dripping onto the floor.  (Tr. 37).

15.      Plaintiff testified that he ultimately lost his left testicle.  It was not surgically removed.  He assumes that it atrophied.  (Tr. 47-48).

16.      Plaintiff has not had any significant pain from this condition since his discharge from the HCU in October, 2000.

17. Lieutenant Craig Mitchell has been employed by the IDOC since June 9, 1984. (Tr. 51). He became a lieutenant in 1991. (Tr. 52).

18. Upon questioning by plaintiff, Mitchell testified that, if plaintiff had been bleeding, Mitchell would have gotten him to the HCU. (Tr. 71). Mitchell denied causing plaintiff not to receive medical treatment. (Tr. 69). Mitchell also denied knowing that plaintiff had assaulted an officer at Galesburg. (Tr. 69).

19. Upon questioning by defense counsel, Mitchell testified that he was unaware of plaintiff's medical condition before October 18, 2000. (Tr. 75).

20. Mitchell testified that, if plaintiff had been bleeding profusely, as plaintiff testified, plaintiff would have been taken to the HCU "immediately." (Tr. 76).

21. Mitchell described the sick call slip procedure. An inmate can put a sick call slip in boxes near the door when they come down for "chow, yard, gym, whatever." They can also put a sick slip in the bars; this is usually done in the evening. Med techs make rounds in the evenings, and pick up the slips from the bars. In the morning, med techs remove the slips from the boxes. (Tr. 77).

22. Mitchell testified that the prison does not have "emergency" sick call passes. A sick call pass has a date and time on it, and the inmate is escorted to the HCU at the time on the pass. (Tr. 79).

23. If plaintiff told Mitchell that he had been put in for a pass to see the doctor, Mitchell would take that to mean that he had already spoken to a med tech and had been referred to a doctor. (Tr. 79).

24. Mitchell would consider the situation that McKee-Bey testified to at trial to be an emergency. (Tr. 84).

25. Mitchell is not a doctor, nurse, or med tech. He has no medical training except for "emergency- type training that everybody gets." (Tr. 88).

26. In October, 2000, there were usually about 470 or 475 inmates in the east cell house. There were about 3,2000 inmates total in Menard. It is not at all unusual for an inmate to come up to Mitchell and ask him something. (Tr. 86-87).

27. There are med techs circulating through the east cell house during the day shift. They are available to inmates all day. (Tr. 87).

28. There are med techs in Menard during the night, but not in each cell house. (Tr. 90).

29. Correctional Officer Steven Horner testified that he escorted plaintiff to the HCU one night. He could not recall whether he called a med tech, or the med tech was making rounds, but the med tech said plaintiff should go to the HCU. The

4

determination of whether it was an emergency was made by the med tech, and not by Horner.  (Tr. 98-99).

30.   Inmate Lawrence McCray testified that he observed that plaintiff was trying to get medical attention for several days.  McCray spoke to Lt. Mitchell about it, and Mitchell said he was aware of the situation and that McKee should "stop crying like a little bitch."  (Tr. 102).

31.   Defendant Rick Reed has been a med tech at Menard for 20 years.  He has been an LPN since 1974.  (Tr. 109).

32.   He has responded to emergency situations many times.  (Tr. 112).

33.   Reed recalls a counselor contacting him about plaintiff's grievance.  The counselor wrote that Reed said that the inmate was informed that he needed to follow sick call procedures.  Reed admitted that statement.  (Tr. 114).

34.   Reed testified that he recalled McKee-Bey stopping him and saying he had a medical problem.  (Tr. 116).  Reed then went back to the med unit and reviewed McKee-Bey's medical jacket, and saw that McKee-Bey had been seen the night before by med tech Morris and referred to a doctor's call line.  (Tr. 117-118).

35.   Reed did not see any evidence of bleeding when he talked with plaintiff.  (Tr. 118-119).  Reed did not consider it to be an emergency situation.  (Tr. 122).

36.   When the med tech comes on duty at 7:00 a.m., he first gets the sick call slips out of the boxes.  The only key to the boxes is on the med tech ring.  If the med tech determines that the inmate needs to be seen right away, he calls the inmate down.  If he does not need to be seen right away, he schedules the inmate to be seen the next day.  (Tr. 123-124).

37.   Plaintiff's medical records (defendants' exhibit 1) indicate that Reed examined plaintiff on September 15, 2000, on a scheduled sick call.  There are no notes by Reed between October 12 and October 17.  This tells Reed that he did not get any sick call slips from plaintiff during that period.  (Tr. 125).

38.   After plaintiff approached him on October 18, Reed reviewed plaintiff's medical records and saw a note written by Rick Morris indicating that Morris saw plaintiff on October 17, 2000, at 9:04 p.m.  About 13 hours later, at about 10:30 the next morning, plaintiff approached Reed.  (Tr. 126).

39.   The fact that Reed told plaintiff that he would check back with him means that Reed did not deem the situation to be an emergency.  He saw no evidence of blood or pus discharge.  If he had, his actions would have been different.  (Tr. 127).

40.   Commissary is 250 to 300 yard from the cell house.  The fact that plaintiff was

able to walk to commissary and back assisted in Reed's determination that it was not an emergency.  (Tr. 128).  The inmates have to wait for some time to do their shopping.  They are sent in groups of 50.  It takes from an hour to an hour and a half from when they leave the cell house to when they return from commissary. (Tr. 129).

41.    Reed has the ability to refer someone to the HCU, but not to admit someone.  (Tr. 137).

42.    Plaintiff testified that his jogging pants were "soaked with blood" when defendants saw him.  (Tr. 151).

43.    Plaintiff testified that he filed "approximately three" sick call slips from October 12 to October 14, 2000, but was not seen.  (Tr. 29).

Plaintiff's medical records were admitted into evidence as Defendants' Exhibit 1.  (Tr. 140-141).  The records include medical progress notes from August 2, 2000, to February 7, 2002.  There is a note written by defendant Reed on September 15, 2000, which indicates that plaintiff was complaining of pain in the left testicular area, which had been present for 2 days. Plaintiff denied any discharge, and there was "no visual defect."  Plaintiff was instructed to avoid lifting or straining, and was referred to the M.D. call line for evaluation.


There is a note written by med tech R. Morris on October 17, 2000, at 9:04 p.m., which indicates that he was called to the cell house to see plaintiff for complaints of left testicle pain and skin peeling.  Morris noted swelling of the left scrotum, with no drainage.  His plan was "reassurance" and to refer plaintiff to the M.D. call line.

The next entry in the medical records is Dr. Kumar's note of October 18, 2000, at 8:20 p.m.  She noted subjective complaints of swelling in scrotal area for about 1 week, with associated pain in scrotum.  Plaintiff told her he noticed skin sloughing 3 days ago, and noticed blood on his underclothes that a.m.  The record makes no mention that blood and pus had been gushing from plaintiff's scrotum, or that his pants had been soaked with blood earlier in the day.

Her objective observation was that plaintiff had superficial swelling of the left scrotum, with

eroded skin, and an "opening draining blood mixed yellow pus. Opening dependant in position."

She admitted him to the infirmary.

McKee-Bey remained in the HCU from October 18, 2000, to October 26, 2000.  The

discharge note indicates a diagnosis of "scrotal abscess."  He was treated with an antibiotic

(Doxycyclene), warm compresses, and pain medication.

There are no further complaints noted about plaintiff's scrotum, and no entries indicating

that he lost his left testicle.

The Court rejects plaintiff's testimony that, when he encountered Mitchell and Reed on

October 18, 2000, he was "bleeding with blood and pus gushing out of his scrotum sack."  (Tr.

15).  The Court also rejects plaintiff's testimony that his jogging pants were "soaked with blood"

when defendants saw him on October 18, 2000.  (Tr. 151).  Plaintiff would have the Court

believe that he walked with his line from the cell house to the commissary, a distance of some

250 to 300 yards, and back, without anyone noticing and reacting to the fact that his pants were

soaked with blood.  Further, the Court finds it unbelievable that both Mitchell and Reed would

ignore an inmate who presented himself with blood soaked pants.  Both defendants testified that,

had plaintiff been bleeding through his pants, they would have gotten him immediate medical

attention.  Having had the opportunity to observe the witnesses, the Court finds that  testimony to

be credible.

**Applicable Law**

The Eighth Amendment prohibits "deliberate indifference to serious medical needs."

*Oliver v. Deen*, **77 F.3d 156, 159 (7th Cir.1996)** (quoting *Estelle v. Gamble*, **429 U.S. 97, 97 St.**

**Ct. 285 (1976)**).  A condition is objectively serious if "failure to treat [it] could result in further

significant injury or unnecessary and wanton infliction of pain."  *Gutierrez v. Peters*, **111 F.3d**

**1364, 1373 (7th Cir.1997)**.

In order to prevail on his deliberate indifference claim, plaintiff must show that the failure to treat was due to a prison official's deliberate indifference to his serious medical needs. Plaintiff must satisfy the two-part test enunciated in *Farmer v. Brennan*, **511 U.S. 825, 834, 114 S.Ct. 1970 (1994)**. The test has both an objective and a subjective component. That is, plaintiff must show (1) his condition was objectively serious, and (2) the defendant acted with deliberate indifference, which is a subjective standard. *Reed v. McBride*, **178 F. 3d 849, 852 (7th Cir. 1999).** Liability under 42 U.S.C. §1983 is personal; there is no liability unless the defendant "caused or participated" in the deprivation of a constitutional right. *Vance v. Peters*, **97 F.3d 987, 991 (7th Cir. 1996)**. Thus, the two-prong *Farmer* test must be satisfied as to each defendant.

An inmate is not constitutionally entitled to "unqualified access to healthcare" or to the best care possible; rather, he is entitled only to "adequate medical care." *Johnson v. Doughty*, **433 F.3d 1001, 1013 (7th Cir. 2006)**. It is proper to consider the "cost of treatment alternatives" in "determining what constitutes adequate, minimum-level medical care." *Id.*

A prison employee who is not a doctor is not liable where he "reasonably relied" on the fact that the inmate was being seen by the medical staff. *Johnson*, **433 F.3d at 1011.** "Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Johnson*, **433 F.3d at 1011 (internal citation omitted.)**

## Analysis

Plaintiff has failed to show that Lieutenant Mitchell violated his Eighth Amendment rights. Mitchell is, of course, not a health care professional. The credible evidence establishes that Mitchell reasonably relied on the fact that plaintiff was receiving medical attention from the

8

medical staff.  According to his own testimony, plaintiff first notified Mitchell that he needed

medical attention on the morning of October 18, 2000.  Plaintiff admitted that he told Mitchell at

that time that he had been seen by a med tech on the previous evening, and that he was supposed

to be "admitted for emergency sick call the previous day." (Tr. 33).  According to Mitchell,

there is no such thing as "emergency sick call." (Tr. 22).  Mitchell testified that, if plaintiff told

Mitchell that he had been put in for a pass to see the doctor, Mitchell would take that to mean

that he had already spoken to a med tech and had been referred to a doctor.  (Tr. 79).

For the reasons stated above, there is no credible evidence that plaintiff presented

Mitchell with an emergency situation requiring immediate medical attention on the morning of

October 18, 2000.  Mitchell knew that McKee-Bey had been seen by a med tech the prior

evening and had been referred to be seen by the doctor.  In the absence of evidence that Mitchell

was presented with information indicating that plaintiff was receiving inadequate or

inappropriate treatment, Mitchell was not required to go outside the ordinary procedures for

delivery of health care to inmates.  Advising plaintiff to use the slick call slip procedure did not

constitute deliberate indifference.  Mitchell was entitled to "rely on the judgment of medical

professionals." ***Johnson*, 433 F.3d at 1011 (internal citation omitted.)**

For similar reasons, plaintiff's case fails as to Reed also.  Plaintiff told Reed he had been

seen by a med tech the prior evening.  Reed reviewed plaintiff's medical records after speaking

with plaintiff on October 18, 2000, and learned that med tech Morris had seen plaintiff at 9:04

p.m. the previous evening and had referred plaintiff for M.D. sick call line.  (Tr. 126).  Plaintiff

presented no credible evidence that Reed should have known that he had an emergency medical

situation that required immediate attention.  Reed testified that he knew that plaintiff had gone to

commissary immediately before their encounter, and that fact assisted him in evaluating the

situation and determining that it was not an emergency.  (Tr. 128-129).  The Court finds that

analysis to be reasonable.  In the absence of an emergency, Reed was not deliberately indifferent by relying on the fact that plaintiff had already been referred for the doctor's call line.

The Court finds that plaintiff has not established that either defendant was deliberately indifferent to his serious medical needs.  The evidence failed to demonstrate that either defendant was aware of any facts from which he should have drawn the conclusion that plaintiff was in need of immediate medical attention on the morning of October 18, 2000.  Both defendants knew that plaintiff had been seen by a med tech the prior evening, and that he had been referred for the M.D. call line for further medical attention.  Plaintiff has not shown a violation of his Eighth Amendment rights.

**Conclusion**

For the foregoing reasons, defendants' Oral Motion for Judgment as a Matter of Law **(Doc. 73)** is **GRANTED**.  The Clerk of Court is directed to enter judgment in favor of defendants Craig Mitchell and Rick Reed.

**IT IS SO ORDERED.**

**DATE:  February 24, 2006.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**